UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Commodity Futures Trading Commission, | | |
| | Plaintiff, | |
| v. | | Case No. _____ |
| Richard Miller; Flip 2 Futures Trading Company LLC; Justin Dendinger; and Punch Drunk Marketing LLC, | | |
| | Defendants. | |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF
AND FOR CIVIL MONETARY PENALTIES
UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From at least July 2019 through November 2020 (the "Relevant Period"), Flip 2 Futures Trading Company LLC ("Flip 2 Futures"), by and through the actions of its officer, employee, and/or agent Richard Miller ("Miller"), acted as a Commodity Trading Advisor ("CTA") without being registered with the Commission as such, by soliciting funds from and engaging in discretionary trading of futures contracts on behalf of a pooled investment vehicle. Flip 2 Futures further held itself out as a CTA by soliciting members of the public via an internet

website and social media platforms to join, for a monthly fee, a live trading room, and soliciting the public to deposit funds with Flip 2 Futures to participate in a "hedge fund."

2.      Throughout the Relevant Period, Miller acted as an Associated Person ("AP") of a CTA, without being registered with the Commission as such, by acting as an officer, employee, or agent of Flip 2 Futures in a capacity that involved soliciting others to provide funds for the purpose of investing in commodity futures trading by Flip 2 Futures and/or Miller.

3.      Flip 2 Futures' failure to register as a CTA violated Section 4m(1)(A) of the Commodity Exchange Act ("Act"), 7 U.S.C. § 6m(1)(A).  Miller's failure to register as an AP of a CTA violated Section 4k(3) of the Act, 7 U.S.C. § 6k(3), and Commission Regulation ("Regulation") 3.12(a), 17 C.F.R. § 3.12(a) (2022).  By knowingly allowing Miller to be associated with Flip 2 Futures, in a capacity that involved solicitation of client funds while not registered as an AP, Flip 2 Futures also violated 7 U.S.C. § 6k(3).

4.      In in-person conversations and email communications with Defendant Justin Dendinger ("Dendinger"), who formed the pooled investment vehicle, Miller knowingly made material misrepresentations and omissions about Miller's futures trading performance  and having other of assets under management, to persuade the prospective client to transfer funds by wire transfer to Flip 2 Futures for the purpose of trading futures contracts.  Miller also misappropriated a total of $13,724.21 in client funds.  By engaging in fraudulent conduct by use of the mails or any means of interstate commerce while acting as a CTA or AP of a CTA, Miller violated Section 4o(1)(A)-(B) of the Act, 7 U.S.C. § 6o(1)(A)-(B).

5.      Further, Flip 2 Futures illegally collected funds from the pooled investment vehicle in its own or Miller's bank and trading accounts, failed to provide the required

Disclosure Document to the pooled investment vehicle, and failed to maintain required records, in violation of Regulations 1.31, 4.30, 4.31, and 4.33, 17 C.F.R. §§ 1.31, 4.30, 4.31, 4.33 (2022).

6.      From at least July 2019 through November 2020, Defendant Punch Drunk Marketing LLC ("PDM"), by and through its members, officers, employees, and/or agents including Defendant Dendinger, acted as a Commodity Pool Operator ("CPO") without being registered with the Commission as such, by soliciting and accepting $400,000 from nine persons ("pool participants") residing in Minnesota and Wisconsin for the purpose of participating in a pooled investment vehicle (the "pool") trading in commodity futures contracts executed by Defendant Flip 2 Futures, by and through Miller.  PDM did not claim any exemption from registration as a CPO.

7.      Dendinger acted as an AP of a CPO without being registered with the Commission as such, by acting as an officer, employee, or agent of PDM in a capacity that involved soliciting others to provide funds for the purpose of investing in the pool.

8.      PDM's failure to register with the Commission as a CPO violated 7 U.S.C. § 6m(1)(A).  Dendinger's failure to register as an AP of a CPO violated Section 4k(2) of the Act, 7 U.S.C. § 6k(2), and 17 C.F.R. 3.12(a) (2022).  By knowingly allowing Dendinger to be associated with PDM in a capacity that involved the solicitation of pool participant funds while not registered as an AP, PDM also violated 7 U.S.C. § 6k(2).

9.      PDM and Dendinger misappropriated a total of $21,400 in pool participants' investment funds by failing to transfer all funds provided to PDM by pool participants for the purpose of futures trading to Flip 2 Futures and Miller for trading as provided in PDM's agreements with pool participants and failing to return to pool participants funds repaid by Flip 2

Futures and Miller. By this conduct, PDM and Dendinger violated Section 4o(1)(A)-(B) of the Act, 7 U.S.C. § 6o(1)(A)-(B).

10.    PDM also illegally commingled pool participant funds with the funds of PDM and Dendinger and failed to provide pool participants with the required Disclosure Documents, in violation of Regulations 4.20(c), and 4.21(a)(1), 17 C.F.R. §§ 4.20(c), 4.21(a)(1) (2022).

11.    Additionally, Defendant Dendinger made a false or misleading statement of a material fact to the Commission in response to a Commission subpoena and letter, in violation of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2).

12.    The acts, omissions, and failures of Miller occurred within the scope of his employment, office, or agency with Flip 2 Futures; therefore, pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B), and Regulation 1.2, 17 C.F .R. § 1.2 (2022), Flip 2 Futures is liable for the acts, omissions, and failures of Miller that constitute violations of the Act and Regulations.

13.    Throughout the Relevant Period, Miller was a controlling person of Flip 2 Futures. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Miller is liable as a controlling person for the actions of Flip 2 Futures in violation of the Act and Regulations.

14.    The acts, omissions, and failures of Dendinger occurred within the scope of his employment, office, or agency with PDM; therefore, pursuant to 7 U.S.C. § 2(a)(l)(B) and 17 C.F .R. § 1.2, PDM is liable for the acts, omissions, and failures of Dendinger that constitute violations of the Act and Regulations.

15.    Throughout the Relevant Period, Dendinger was a controlling person of PDM. Therefore, pursuant to 7 U.S.C. § 13c(b), Dendinger is liable as a controlling person for the actions of PDM in violation of the Act and Regulations.

16.    Unless restrained and enjoined by this Court, Defendants, directly or through their corporate successors, will likely continue to engage in the acts and practices alleged in this Complaint, or in similar illegal acts and practices, as described more fully below.

17.    Accordingly, the Commission brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations promulgated thereunder, and to enjoin them from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement from Defendants, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.    JURISDICTION AND VENUE

18.    The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

19.    Venue lies properly in this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District and certain transactions, acts, practices, and courses of business in violation of the Act occurred, are occurring, or are about to occur in this District, among other places.

### III.    THE PARTIES

**A.  Plaintiff**

20.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

**B.  Defendants**

21.    Defendant **Richard "Rick" Miller**, a Minnesota resident, was the sole owner and operator of Flip 2 Futures.  Miller has never been registered with the Commission in any capacity.

22.    Defendant **Flip 2 Futures Trading Company LLC** was a limited liability company formed in Minnesota in December 2018.  The company was administratively terminated in February 2020.[1]  Flip 2 Futures has never been registered with the Commission in any capacity.

23.    Defendant **Justin D. Dendinger**, a Wisconsin resident, is the Managing Member of PDM and signatory to its bank account.  Dendinger has never been registered with the Commission in any capacity.

24.    Defendant **Punch Drunk Marketing LLC** is a limited liability company formed in Wisconsin in October 2012.  Dendinger co-owns PDM with a business partner.  PDM has never been registered with the Commission in any capacity.

---

[1] Pursuant to Minn. Stat. § 302A.821, claims against an administratively dissolved entity are not barred.

## IV.    FACTS

### A.  Flip 2 Futures Held Itself Out as a Commodity Trading Advisor

25.     During the Relevant Period, Flip 2 Futures, acting by and through its officer and agent Miller, held itself out as a CTA by soliciting members of the public, via its website flip2futures.com, YouTube, Twitter, Craigslist, and/or Discord, to join for a monthly fee a live trading room in which subscribers could watch Miller trade, listen to Miller discuss market conditions and his trading strategy, and replicate Miller's trading.  It also solicited members of the public to deposit funds with Flip 2 Futures in order to participate in a "hedge fund."

26.     Miller registered the domain name "flip2futures.com" ("website") in June 2018. The website was removed from public access sometime after June 11, 2020.

27.     During the Relevant Period, Flip 2 Futures' website offered paid access to a "Live Trading Room" in which subscribers could simultaneously replicate trades purportedly executed by Flip 2 Futures and/or Miller.  The website stated, in part:

     a.    "Our team has been trading for over 5 years.  We are looking for roughly 150 traders form all over the world to form our futures trading room . . . .  Trading Strategy Learn how to take the exact trades our team does and profit consistently!"

     b.    "For a limited time only our trading room is 50% off thru the month of May for $325.00 that gets you 30 days access to our trading room and our Discord Channel.  In there you will find a general education section that will give you details on how we trade.  If you like the trading room and want to continue that costs are $650 per month.  Even trading 1 lot most of our traders are paying their dues within 1-2 trading sessions max . . . ."

28. Flip 2 Futures' website also advertised the "Flip2 Futures Hedge Fund." The website stated, in part:

    a. "Our Team Has a Report Card Worth Bragging About Our team is at the top of their game. We are here to provide value to your portfolio. Please give us a chance to prove how much we can bring to your bottomline [*sic*]."

    b. "Join our hedgefund—we take the trades—you reap the rewards."

    c. "Minimum Investment: $500K Locked In: 12 months Profit is split 50/50 No Other Fees Apply."

29. On May 1, 2019, Miller paid to post the following advertisement on Craigslist in the "Financial Services" category for the Minneapolis, MN, area:

> I own and operate Flip2 Futures Trading Company. We have a channel on YouTube where we record every trade. I am looking for 2 more investors in 2019. Local investors only.
> Min. Investment: $250,000-$500,000
> Lockdown: 12 Months
> Terms: Split profits 50/50—paid weekly. No other charges for assets under management.
> Check out www.flip2futures.com for more information . . . .

On information and belief, the advertisement was publicly available through at least June 1, 2019.

30. From January 2018 through June 2019, Flip 2 Futures and/or Miller posted at least 72 videos to YouTube showing Miller's purported trading in the futures market and directing members of the general public to Flip 2 Futures' website, Twitter account, live trading room, and Discord channel.

31. For example, on July 16, 2018, Flip 2 Futures and/or Miller posted a video on YouTube titled "Trading Oil Futures - 07/16/2018 9am Session $5958.80 Profit - Flip2 Futures". A further description stated:

What an awesome trading session. Pay attention to the price action
everybody. This is what it is all about. Join our trading room and you can
follow my lead on this trade!!
Check us out at https://www.flip2futures.com or on Twitter
https://twitter.com/Flip2Futures

## B. Miller's Solicitation of PDM

32.     In late 2018 or early 2019, Defendant Dendinger began paying a monthly fee for
access to Flip 2 Futures' trading room.  The trading room consisted of daily access, generally
from 8:00 a.m. to 12:00 p.m., to a virtual meeting room providing a view of Miller's trading
screen and oral commentary by Miller, along with simultaneous access to a group chat on
Discord.  In or about mid-2019, Miller stopped requiring Dendinger to pay for access to the Flip
2 Futures trading room.

33.     In or about July 2019, Dendinger met with Miller in person and discussed Miller's
trading performance.  Miller showed to Dendinger on Miller's mobile phone purported trading
reports generated within a trading application.  The reports falsely represented that Miller's past
futures trading generated substantial gains.

34.     During the meeting between Miller and Dendinger, Miller falsely stated that he
had been managing a trading fund holding millions of dollars invested by multiple individuals.
Miller declined to provide Dendinger with performance history reports for the fund.

## C. Flip 2 Futures' Agreement To Trade on Behalf of PDM

35.      On July 22, 2019, Flip 2 Futures entered into an "Investment Agreement" with
PDM.  The Investment Agreement stated, among other things, that:

   a.   "[Flip 2 Futures] operates a futures trading operation.  [PDM] wishes to
        provide funding in order to expand and enhance [Flip 2 Futures'] business, but
        does not expect or wish to obtain an equity or ownership stake in

9

[Flip2Futures]; rather, it is the intention of the parties that [PDM] will participate in profits according to the plan set forth in this agreement."

b. "[PDM] will pay $150,000 ('the Capital') to [Flip 2 Futures] on or before July 24, 2019[.]"

c. "As consideration for the capital payment . . . [Flip 2 Futures] is authorized to retain fifty percent (50%) of all profits derived from the management of the Capital, in keeping with the detailed compensation plat set forth in the attached Exhibit A . . . ."

36.    Regarding "Profit Sharing and Payment Details," Exhibit A to the Investment Agreement stated, in part:

a. "[PDM] will wire transfer funds in the amount of $150,000 to Flip2Futures business banking account . . . ."

b. "Flip2Futures will transfer/wire money in the amount of $150,000 to brokerage account (trading account), Dorman account number [********]402";

c. "Flip2Futures is the sole owner of the Dorman account . . . .";

d. "All Trading decisions and executions for this account will be made 100% by Flip2Futures . . . .";

e. "Flip2 Futures makes no claim or promises of profits. Flip2 Futures is not responsible for losses."

f. "All fees associated with this account will be the responsibility of [PDM] and will not be considered when setting commissions."

g. "Commissions will be 50% of the current week's profits."

10

h.  "Profits are defined as all money earned/made above the current established basis."

37.    The Investment Agreement was signed on July 22, 2019, by Miller on behalf of Flip 2 Futures and by Dendinger as "managing member" of PDM.

38.    Flip 2 Futures and Miller failed to provide to PDM the Disclosure Document as required by Regulation 4.31, 17 C.F.R. § 4.31 (2022).

**D.  PDM's 2019 Pool Participants**

39.    Neither Dendinger nor PDM deposited their own funds with Flip 2 Futures or Miller.  Rather, in or about July 2019, Dendinger approached several golf acquaintances to invest in a "futures trading opportunity" through PDM.

40.    During discussions with a group of prospective pool participants, Dendinger represented that the funds deposited with PDM by prospective pool participants would be transferred to a day trader based in Minnesota named Rick Miller.  Dendinger stated that Miller would place the funds in his personal trading account and use the funds to trade oil futures.  Dendinger also promised that each participant would earn six percent monthly returns on his or her investment for a period of fourteen months.

41.    Based on Dendinger's representations, Participant #1 decided to invest in futures trading through PDM.  On July 24, 2019, Dendinger, on behalf of PDM, signed a "Promissory Note" promising to pay Participant #1 $25,000 plus 6% per month interest, in twelve monthly payments of $1,500, with a sum total of $29,500.

42.    On or about July 11, 2019, Participant #1 issued a check from his business' bank account in the amount of $25,000 payable to PDM.  Participant #1's funds were deposited into PDM's US Bank account *4501.

43.    In July 2019, three other individuals entered into "Investor Agreements" with PDM pursuant to which they joined "as one of many investor[s]" in PDM's "14 Month/6% Monthly Program" and PDM agreed, among other things, to "have Investor's money deposited into Rick Miller[']s trading account for the purposes of placing trades in the futures market." The agreements also provided that "[PDM] will draw monthly on Rick Miller's account in the amount equal to 6% of the original invested amount.  Payments of 6% of the original invested amount will be made to Investor monthly," with "[t]he last payment . . . in the amount equal to the original investment PLUS the two initial deferred monthly payments of 6%."

44.    The Investor Agreement further provided that "Investor may choose [ ] NOT to receive monthly 6% [ ] payment.  In exchange monthly payment will be added to Investor's original principal amount at a rate of 6% per month."

45.    Neither PDM nor Dendinger delivered to the 2019 pool participants a Disclosure Document as described in 17 C.F.R. §§ 4.21 and 4.24.

46.    From July 8, 2019, through July 12, 2019, PDM accepted a total of $150,000 from four individuals, including Participant #1, for the purpose of a pooled investment in futures contracts to be traded by Miller.  The $150,000 was collected into PDM's US Bank account number *4501.

47.    PDM and Dendinger collected the investors' funds into the same bank account in which PDM held its own business funds and conducted its regular financial transactions, including compensation payments to Dendinger and his business partner.

48.    On July 23, 2019,  PDM transferred $150,000 by wire to Wells Fargo Bank account *8004 in the name of Flip 2 Futures.

49.    On July 25, 2019, Miller transferred $148,850 to Wells Fargo Bank account *0711, in the names of Miller and his wife.  Miller and his wife held personal funds in Wells Fargo Bank account *0711 and used the account to pay personal living expenses.  On July 29, 2019, Miller transferred by wire $148,850.02 from his personal Wells Fargo Bank account *0711 to his personal Dorman Trading account **402.

50.    Miller misappropriated $1,149.98 in pool participant funds by failing to transfer the funds to a trading account as provided in Flip 2 Futures' agreement with PDM.

**E.  PDM's 2020 Pool Participants**

51.    In or about January 2020, Dendinger again approached golf acquaintances about investing in futures trading.  Dendinger indicated that participants would have to provide a minimum of $25,000 by February 5, 2020.

52.    On January 16, 2020, Dendinger sent an email to prospective new pool participants.  In the email Dendinger stated that he had actively traded with Miller for one year and that he consistently saw Miller making between $5,000 and $20,000 per day and that Miller almost never lost.  Dendinger's email further stated that Miller managed two accounts:  (1) a personal account which had around $8 million; and (2) his fund, in which he managed approximately $50 million for lots of investors.  On information and belief, Dendinger made these representations based on representations from Miller.

53.    Because he received the expected monthly payments from his first investment with PDM, Participant #1 agreed to invest additional funds with PDM.  On February 5, 2020, Participant #1 issued another check from his business' bank account in the amount of $25,000 payable to PDM.  On the memo line, Participant #1 wrote "Promissory Note Investment Loan."

Participant #1's funds were deposited into PDM's US Bank account *4501.  A second promissory note was never executed.

54.    Between January and February 2020, five other individuals, including Participant #2, entered into "Investor Agreements" with PDM pursuant to which they were enlisted in PDM's "14 Month/6% Monthly Program" and PDM agreed, among other things, to "have Investor's money deposited into Rick Miller's trading account for the purposes of placing trades in the futures market."  The agreements also provided that "[PDM] will draw monthly on Rick Miller's account in the amount equal to 6% of the original invested amount.  Payments of 6% of the original invested amount will be made to Investor monthly . . . ," with "[t]he last payment . . . will be in the amount equal to the original investment plus 18%."

55.    Between January 28, 2020 and February 6, 2020, these six individuals collectively deposited, by check and wire transfer, a total of $250,000 into PDM's US Bank account *4501.

56.    Neither PDM nor Dendinger delivered to the 2020 pool participants a Disclosure Document as described in Regulations 4.21 and 4.24, 17 C.F.R. §§ 4.21, 4.24 (2022).

57.    On February 7, 2020, Dendinger transferred $240,000 from PDM's US Bank account *4501 to his personal US Bank account *3377.  On February 13, 2020, Dendinger transferred by wire $234,000 of the pool participants' funds from his personal US Bank account *3377 to Flip 2 Futures' Wells Fargo Bank account *8004.

58.    On February 14, 2020, Dendinger made payments to two 2019 pool participants, totaling $3,000 from PDM's US Bank account *4501.

59.    PDM and Dendinger misappropriated $13,000 in Pool Participant funds by failing to transfer the funds to Miller's trading account as provided in PDM's agreements with pool participants.

60.     On February 13, 2020, Miller transferred $233,088.76 from Flip 2 Futures' Wells Fargo Bank account *8004 to Miller's personal Wells Fargo Bank account *0711.  On February 14, 2020, Miller transferred by wire $232,000 from his personal Wells Fargo Bank account *0711 to his personal Dorman Trading account **402.

61.     Miller misappropriated $2,000 in pool participant funds by failing to transfer the funds to a trading account as provided in Flip 2 Futures' agreement with PDM.

**F.  Miller's Commodity Interest Trading Account**

62.     On April 20, 2018, Miller opened commodity interest trading account number **402 in his own name with Dorman Trading.  Dorman Trading is registered with the Commission as a Futures Commission Merchant ("FCM").

63.     From May 2018 through July 2019—before accepting funds from PDM—Miller traded in only 9 out of 15 months, executing trades in crude oil and E-mini S&P 500 futures contracts in Dorman Trading account **402.  During this time, Miller's trading earned net profits in only three months: $423 in May 2019, $442.50 in August 2018, and $3,286 in February 2019.  Miller's trading sustained net losses in the remaining 6 months, ranging from $469.54 to $5,259.

64.     From August 2019 through November 2020, in Dorman Trading account **402, Miller bought and sold NY Light Crude Oil, E-mini S&P 500, CME Micro S&P, and IMM E-mini NASDAQ-100 futures contracts traded on CME, a designated contract market authorized by the Commission.

65.     From August 2019 through November 2020, Miller's trading sustained net losses in all but one month.  His trading earned $3,035.95 net profits in July 2020.  In the other months, his net monthly trading losses ranged from $1,224.76 to $128,139.69.

66.    On or about May 12, 2020, Miller wrote to Dendinger via email: "Profits fell for the fund last month over 90% due to increased margins.  Once again just like March we are seeing things I have never seen in the market.  Regardless I am going to give it to you straight.  March was down 12% I was able to recoup 8% in April so we are still down 4% as of fast Friday.  Margins have increased to 11 x in CL.  CL is where I make my money so this has severely impacted profits."

67.    For the month of March 2020, Miller's trading in Dorman Trading account **402 actually sustained net losses of over $128,000, almost 50% of the account's monthly beginning balance.

68.    For the month of April 2020, Miller's trading in Dorman Trading account **402 actually sustained net losses of over $39,000, approximately 37% of the account's monthly beginning balance.

69.    On May 19, 2020,  Miller sent Dendinger an email with an attached Word document.  The attachment contained a statement from Miller that "[W]e are in a very bad spot right now.  I took an ELE—Extinction Level Event . . . .  We've lost 97% of our portfolio because of adding to losing trades . . . ."

70.    Miller and Dendinger decided to continue trading the remaining funds, in an effort to recoup the losses.  However, from June 2020 through November 2020, Miller's trading suffered overall losses, depleting the remaining funds collected from PDM.

71.    From August 2019 through November 2020, Miller's trading in Dorman Trading account **402 resulted in total losses of over $326,000.

72.     During the Relevant Period, Miller transferred a total of $40,900 from the trading account directly to PDM.  During the same period, Miller transferred a total of $12,092.20 from the trading account to Flip 2 Futures' Wells Fargo account *8004.

73.     Pursuant to Flip 2 Futures' agreement with PDM, Flip 2 Futures and Miller were entitled to at most $1,517.97 in profits from Miller's trading.

74.     Miller misappropriated $10,574.23 in pool participant funds by failing to transfer the funds to PDM.

**G.  Payments to PDM and Pool Participants**

75.     From October 2019 through June 2020, Flip 2 Futures returned a total of $40,900 to PDM.

76.     From October 2019 through June 2020, PDM paid a total of $26,500 to pool participants, including the $3,000 referenced above, and $9,000 was deposited into Dendinger's personal futures trading account for trading by Dendinger, by agreement with one pool participant.

77.     Thereafter, PDM did not returned any additional amounts to the pool participants despite their requests for payment.

78.     PDM misappropriated $8,400 in pool participant funds returned to PDM by Flip 2 Futures.

**H.  Flip 2 Futures' Records**

79.     On May 18, 2021, the Commission served a subpoena *duces tecum* on Miller, requesting documents related to Flip 2 Futures' activity as a CTA, including:  (1) All account statements for any trading account used; (2) All communications between Flip 2 Futures and/or Miller and any person from whom they received funds or assets in any form for the purpose of

investment or trading; (3) All documents provided to any prospective customer, including but not limited to brochures, prospectuses, reports, disclosure documents, advertisements, presentations, or other marketing materials; (4) All account statements or performance statements prepared for any customer/investor; (5) The amount, date, and payor of each separate payment or funds transfer received from each investor; and (6) All account statements for any bank or other financial account used to send, receive, or transfer funds in connection with futures trading.

80.     On June 25, 2021, Miller sent an email to Commission Staff along with a PDF attachment.  The attachment contained a written response to the subpoena stating "Here is everything I have for PDM."  The only documents accompanying the response were a copy of the Investment Agreement with PDM and a copy of a form 1099B from Dorman Trading for the year 2020.

**I.  Dendinger's False Statements to the CFTC**

81.     On May 18, 2021, Commission Staff issued subpoenas *duces tecum* to Dendinger and PDM, service of which was accepted by their attorney.  The subpoenas sought certain categories of documents, including:

> All account statements and opening documents for any account you used to enter into any transactions involving any of the Financial Products (as defined above), including, but not limited to, all accounts at any futures commission merchant, introducing broker, or retail foreign exchange dealer, located in the United States or in another country, that were opened or maintained in your name or in the name of any other sole proprietorship, partnership, limited liability company, or corporation owned, controlled, operated, or managed by you.

82.     The subpoena defined "Financial Products" as "commodity futures, options on commodity futures, commodity options, foreign currency contracts, and/or retail commodity transactions."

83.     In a June 17, 2021, response to the CFTC's subpoena, Dendinger, via his counsel, stated that "No accounts controlled by the parties were used to enter into any transactions involving any Financial Products as defined in the Subpoena Documents that the parties are aware of."

84.     On July 9, 2021, CFTC Staff wrote a letter to Dendinger, via his counsel, seeking clarification of the response, writing:

> Item No. 1 of the Subpoenas seeks account statements and opening documents for any accounts held by Mr. Dendinger, . . . and/or any entity or commodity pool controlled by them, including but not limited to Punch Drunk Marketing LLC, that they (individually or collectively) used to enter into any transactions involving any of the "Financial Products" during the period of January 1, 2017 to the present (the "Relevant Time Period"). As defined in the Subpoenas, the "Financial Products" referenced in Item No. 1 include commodity futures, options on commodity futures, commodity options, foreign currency contacts, and/or retail commodity transactions. Please note that any accounts held in your clients' names at any futures commission merchant ("FCM") would be subject to Item No. 1. We understand from your clients' written responses to Item No. 1 that they are taking the position that they held no accounts at any FCM or other financial institution in which they traded any of the Financial Products during the Relevant Time Period. Please confirm in writing that our understanding of their position is accurate by July 19, 2021.

85.     In a July 22, 2021, response, Dendinger, via his counsel, stated that he and PDM had "no accounts in their names with any futures commission merchant, nor have they engaged in any trading of any Financial Products."

86.     In fact, in February 2017, Dendinger opened futures trading account **7578 in the name of PDM with Dorman Trading, a registered FCM. No trading occurred in this account.

87.     Additionally, Dendinger opened futures trading account **8715 in his own name with Dorman Trading in October 2018. From November 2018 through June 2021, Dendinger executed trades in crude oil and E-mini S&P 500 futures contracts in the account.

88.    Dendinger knew that the Commission had requested documents regarding his and PDM's futures trading accounts.  On information and belief, Dendinger provided his attorney the information in the June 17, 2021, response to the May 18, 2021 subpoena and in the July 22, 2021, letter about his and PDM's futures trading accounts.  Dendinger's attorney acted as his agent in submitting the June 17, 2021, in response to the May 18, 2021 subpoena and the July 22, 2021, letter to Commission Staff.

89.    Dendinger's statement in the June 17, 2021, response to the CFTC's subpoena that "No accounts controlled by the parties were used to enter into any transactions involving any Financial Products as defined in the Subpoena Documents that the parties are aware of" was false and misleading.

90.    Dendinger's statement in the July 22, 2021, letter that he and PDM had "no accounts in their names with any futures commission merchant, nor have then engaged in any trading of and Financial Products" was false and misleading.

91.    Dendinger's statements that he and PDM had "no accounts in their names with any futures commission merchant, nor have they engaged in any trading of and Financial Products" were material to the Commission's investigation, in that the falsely indicated that Dendinger had not personally engaged in trading and may not be fully aware of the risk of loss in trading commodity futures.  Dendinger's statement was also capable of distracting the Commission from inquiring further into Dendinger's own offer to trade and/or trading on behalf of one or more PDM pool participants.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Violations of Section of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
(Fraud by CTAs and APs of CTAs)
(Flip 2 Futures and Miller)**

92.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

93.    A CTA is defined in Section 1a(12)(A)(i) of the Act, 7 U.S.C. § 1a(12)(A)(i), in relevant part, as "any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value or advisability of trading in" commodity interests.

94.    An AP of a CTA is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022), in relevant part, as any "partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves [ ] the solicitation of a client's or prospective client's discretionary account."

95.    During the Relevant Period, Flip 2 Futures acted as a CTA, under Miller's direction and control, and Miller acted as an AP of a CTA, by soliciting funds from PDM for discretionary futures trading by Miller.

96.    7 U.S.C. § 6*o*(1)(A)-(B), makes it unlawful for a CTA or an AP of a CTA, "by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly – —(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."  As provided in Regulation 4.15, 17 C.F.R. § 4.15 (2022), 7 U.S.C. § 6*o*(1)

applies to all CTAs and APs of CTAs whether registered, required to be registered, or exempted from registration.

97.    During the Relevant Period and as described above, Flip 2 Futures, acting as a CTA, and Miller, acting as an AP of a CTA, while using the mails or other means or instrumentalities of interstate commerce, violated 7 U.S.C. § 6*o*(1)(A)-(B) by making false and misleading statements and otherwise deceiving Dendinger and/or PDM about:

        a.  the profitability of Miller's past trading; and

        b.  having other funds under management.

98.    During the Relevant Period and as described above, Flip 2 Futures, acting as a CTA, and Miller, acting as an AP of a CTA, while using the mails or other means or instrumentalities of interstate commerce, violated 7 U.S.C. § 6*o*(1)(A)-(B) by misappropriating funds provided by PDM for futures trading.

99.    The foregoing acts, omissions, and failures by Miller occurred within the course or scope of his employment or office with Flip 2 Futures.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Flip 2 Futures is liable as a principal for Miller's violations of 7 U.S.C. § 6o(1)(A)-(B).

100.    Each misrepresentation or omission of material fact, employment of a device, scheme, or artifice to defraud, and transaction, practice, or course of business which operated as a fraud or deceit made during the Relevant Period, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6o(1)(A) and/or (B).

## COUNT TWO

**Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1)**
**(Failure to Register as a CTA)**
**(Flip 2 Futures and Miller)**

101.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

102.    Flip 2 Futures, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading contracts of sale of a commodity for future delivery, such as oil futures, thus making it a CTA as defined, in relevant part, by Section 1a(12) of the Act, 7 U.S.C. § 1a(12).

103.    Flip 2 Futures held itself out generally to the public as a CTA.

104.    Flip 2 Futures was not exempt from registering as a CTA.

105.    Flip 2 Futures made use of the mails or other means of interstate commerce in connection with its business as a CTA, while failing to register with the Commission as a CTA, in violation of 7 U.S.C. § 6m(1).

106.    During the Relevant Period, Miller held and exercised direct or indirect control over Flip 2 Futures, and either did not act in good faith or knowingly induced, directly or indirectly, Flip 2 Futures' violations, and is therefore liable as a controlling person of Flip 2 Futures, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), for Flip 2 Futures' violations of 7 U.S.C. § 6m(1).

## COUNT THREE

**Violations of Section 4k(3) of the Act, 7 U.S.C. § 6k(3),
and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2022)
(Failure to Register as an AP of a CTA; Permitting an Unregistered AP of a CTA)
(Miller and Flip 2 Futures)**

107.    The allegations set forth in the preceding paragraphs are re-alleged and

incorporated herein by reference.

108.    U.S.C. § 6k(3), in relevant part, makes it "unlawful for any person to be

associated with a commodity trading advisor as a partner, officer, employee, consultant, or agent

(or any person occupying a similar status or performing similar functions), in any capacity which

involves (i) the solicitation of a client's or prospective client's discretionary account or (ii) the

supervision of any person or persons so engaged, unless such person is registered with

the Commission under this chapter as an associated person of such commodity trading advisor

and such registration shall not have expired, been suspended (and the period of suspension has

not expired), or been revoked."

109.    7 U.S.C. § 6k(3), in relevant part, further makes it "unlawful for

a commodity trading advisor to permit such a person to become or remain associated with

the commodity trading advisor in any such capacity if the commodity trading advisor knew or

should have known that such person was not so registered or that such registration had expired,

been suspended (and the period of suspension has not expired), or been revoked."

110.    17 C.F.R. § 3.12(a), makes it "unlawful for any person to be associated with a . . .

commodity trading advisor… as an associated person unless that person shall have registered

under the Act as an associated person of that sponsoring . . . commodity trading advisor. . . ."

111.    During the Relevant Period, Miller acted as an officer, employee, or agent of Flip 2 Futures in a capacity that involved soliciting others to provide funds for the purpose of investing in commodity futures trading by Flip 2 Futures.

112.    Miller was required to register as an AP of a CTA.  By failing to register, Miller violated 7 U.S.C. § 6k(3) and Regulation 3.12(a).

113.    During the Relevant Period, Flip 2 Futures permitted Miller to become or remain associated with Flip 2 Futures.  Flip 2 Futures knew that Miller was not registered as an AP. Accordingly, Flip 2 Futures violated 7 U.S.C. § 6k(3).

114.    Throughout the Relevant Period, Miller held and exercised direct or indirect control over Flip 2 Futures, and either did not act in good faith or knowingly induced, directly or indirectly, Flip 2 Futures' violations, and is therefore liable as a controlling person of Flip 2 Futures, pursuant to 7 U.S.C. § 13c(b), for Flip 2 Futures' violations of 7 U.S.C. § 6k(3).

## COUNT FOUR

**Violation of Regulation 4.30(a), 17 C.F.R. § 4.30(a) (2022)**
**(Accepting Client Funds in CTA's Name)**
**(Flip 2 Futures and Miller)**

115.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

116.    17 C.F.R. § 4.30(a), prohibits a CTA from soliciting, accepting or receiving from an existing or prospective client funds, securities or other property in the trading advisor's name (or extend credit in lieu thereof) to purchase, margin, guarantee or secure any commodity interest of the client.

117.    During the Relevant Period, Flip 2 Futures solicited, accepted, and received from PDM funds in Flip 2 Futures' name to purchase, margin, guarantee or secure commodity futures trading for PDM, in violation of 17 C.F.R. § 4.30(a).

118.    Throughout the Relevant Period, Miller held and exercised direct or indirect control over Flip 2 Futures, and either did not act in good faith or knowingly induced, directly or indirectly, Flip 2 Futures' violations, and is therefore liable as a controlling person of Flip 2 Futures, pursuant to 7 U.S.C. § 13c(b), for Flip 2 Futures' violations of 17 C.F.R § 4.30(a).

## COUNT FIVE

### Violation of Regulation 4.31(a), 17 C.F.R. § 4.31(a) (2022)
### (Failure to Provide Disclosure Document)
### (Flip 2 Futures and Miller)

119.    17 C.F.R. § 4.31(a) requires each CTA registered or required to be registered under the Act to deliver or cause to be delivered to a prospective client a Disclosure Document prepared in accordance with Commission Regulations.

120.    During the Relevant Period, Flip 2 Futures, which acted as a CTA, failed to deliver to PDM a Disclosure Document prepared in accordance with Commission Regulations.

121.    Throughout the Relevant Period, Miller held and exercised direct or indirect control over Flip 2 Futures, and either did not act in good faith or knowingly induced, directly or indirectly, Flip 2 Futures' violations, and is therefore liable as a controlling person of Flip 2 Futures, pursuant to 7 U.S.C. § 13c(b), for Flip 2 Futures' violations of 17 C.F.R § 4.31(a).

## COUNT SIX

**Violation of Regulations 1.31 and 4.33, 17 C.F.R. § 1.31, 4.33 (2022)**
**(Failure to Make and Keep Records)**
**(Flip 2 Futures and Miller)**

122.    17 C.F.R. § 4.33 requires that "Each commodity trading advisor registered or required to be registered under the Act must make and keep" certain books and records in an accurate, current and orderly manner at its main business office and in accordance with Regulation 1.31, 17 C.F.R. § 1.31 (2022). Specifically, CTAs are required to make and keep books and records concerning clients and subscribers, including name and address, written agreements, records of commodity interest accounts and all transactions, and statements, among other things.

123.    17 C.F.R. § 1.31, requires CTAs to retain books and records required under 17 C.F.R. § 4.33 and to make them available to the Commission.

124.    In violation of 17 C.F.R. §§ 1.31 and 4.33, Flip 2 Futures, which acted as a CTA, failed to make, keep, and/or make available to the Commission required records, including: (1) All account statements for any trading account used; (2) All communications between Flip 2 Futures and/or Miller and any person from whom they received funds or assets in any form for the purpose of investment or trading; (3) All documents provided to any prospective customer, including but not limited to brochures, prospectuses, reports, disclosure documents, advertisements, presentations, or other marketing materials; (4) All account statements or performance statements prepared for any customer/investor; (5) The amount, date, and payor of each separate payment or funds transfer received from each investor; and (6) All account statements for any bank or other financial account used to send, receive, or transfer funds in connection with futures trading.

125.    Throughout the Relevant Period, Miller held and exercised direct or indirect control over Flip 2 Futures, and either did not act in good faith or knowingly induced, directly or indirectly, Flip 2 Futures' violations, and is therefore liable as a controlling person of Flip 2 Futures, pursuant to 7 U.S.C. § 13c(b), for Flip 2 Futures' violations of 17 C.F.R §§ 1.31 and 4.33.

## COUNT SEVEN

**Violations of Section of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)**
**(Fraud by CPOs and APs of CPOs)**
**(PDM and Dendinger)**

126.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

127.    A CPO is defined in Section 1a(11)(A) of the Act, 7 U.S.C. § 1a(11)(A), in relevant part, as any person:

> (i) engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any [ ] commodity for future delivery[.]

128.    An AP of a CPO is defined in 17 C.F.R. § 1.3, in relevant part, as any "partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves [ ] the solicitation of funds, securities, or property for a participation in a commodity pool . . . ."

129.    During the Relevant Period, PDM acted as a CPO, under Dendinger's direction and control, and Dendinger acted as an AP of a CPO, by soliciting and accepting funds from others for the purpose of participating in a pooled investment vehicle trading in commodity futures contracts.

28

130.    Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1), states that:

It shall be unlawful for a . . . commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly−(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

131.    During the Relevant Period and as described above, PDM, acting as a CPO, and Dendinger, acting as an AP of a CPO, while using the mails or other means or instrumentalities of interstate commerce, violated 7 U.S.C. § 6*o*(1)(A)-(B) by misappropriating pool participant funds.

132.    The foregoing acts, omissions, and failures by Dendinger occurred within the course or scope of his employment or office with PDM.  Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 , PDM is liable as a principal for Dendinger's violations of 7 U.S.C. § 6*o*(1)(A)-(B).

133.    Each employment of a device, scheme, or artifice to defraud, and transaction, practice, or course of business which operated as a fraud or deceit made during the Relevant Period, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A) and/or (B).

### COUNT EIGHT

**Violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1)**
**(Failure to Register as a CPO)**
**(PDM and Dendinger)**

134.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

135.    With certain specified exceptions and exemptions not applicable here, 7 U.S.C. § 6m(1) makes it unlawful for any CPO to make use of the mails or any means or instrumentality

29

of interstate commerce in connection with its business, unless it is registered with the Commission.

136.    As alleged herein, throughout the Relevant Period, PDM acted as an unregistered CPO, and accordingly violated 7 U.S.C. § 6m(1), by using the mails and other means and instrumentalities of interstate commerce in connection with its business as a CPO by operating or soliciting funds for a commodity pool that engaged in commodity futures trading, without having registered with the Commission as a CPO.

137.    PDM did not claim any exemption from registration as a CPO.

138.    During the Relevant Period, Dendinger held and exercised direct or indirect control over PDM, and either did not act in good faith or knowingly induced, directly or indirectly, PDM's violations, and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for PDM's violations of 7 U.S.C. § 6m(1).

### COUNT NINE

**Violations of Section 4k(1) of the Act, 7 U.S.C. § 6k(2),
and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2022)
(Failure to Register as an AP of a CPO; Permitting an Unregistered AP of a CPO)
(Dendinger and PDM )**

139.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

140.    With certain specified exceptions and exemptions not applicable here, 7 U.S.C. § 6k(2)(i) makes it unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool, . . . unless such person is registered with the Commission" as an AP of the CPO.

141.    7 U.S.C. § 6k(2), also prohibits a CPO from permitting "such a person to become or remain associated with" it, in any such capacity, if the CPO knew or should have known that such person was not registered as an AP.

142.    17 C.F.R. § 3.12(a), makes it "unlawful for any person to be associated with a . . . commodity pool operator . . . as an associated person unless that person shall have registered under the Act as an associated person of that sponsoring . . . commodity pool operator. . . ."

143.    During the Relevant Period, Dendinger was associated with PDM as an officer, employee, director and owner; in addition, Dendinger solicited investments on behalf of PDM in the commodity pool operated by PDM. As such, Dendinger was required to register as an AP of a CPO.  By failing to register, Dendinger violated 7 U.S.C. § 6k(2), and 17 C.F.R. § 3.12(a).

144.    During the Relevant Period, PDM permitted Dendinger to become or remain associated with PDM.  PDM knew that Dendinger was not registered as an AP.  Accordingly, PDM violated 7 U.S.C. § 6k(2).

145.    Throughout the Relevant Period, Dendinger held and exercised direct and indirect control over PDM, and either did not act in good faith or knowingly induced, directly or indirectly, PDM's violations, and is therefore liable as a controlling person of PDM, pursuant to 7 U.S.C. § 13c(b), for PDM's violations of 7 U.S.C. § 6k(2).

## COUNT TEN

**Violations of Regulation 4.20(c), 17 C.F.R. §§ 4.20(c) (2022)**
**(Commingling of Funds)**
**(PDM and Dendinger)**

146.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

147.    17 C.F.R. § 4.20(c), prohibits a CPO from commingling the property of a commodity pool with the property of any other person.

148.    During the Relevant Period and as described above, PDM commingled pool participant funds with funds of other persons, including funds belonging to PDM and Dendinger, in violation of 17 C.F.R. § 4.20(c).

149.    Each commingling of a pool participant's funds is alleged as a separate and distinct violation by PDM of 17 C.F.R. § 4.20(c).

150.    Throughout the Relevant Period, Dendinger held and exercised direct or indirect control over PDM, and either did not act in good faith or knowingly induced, directly or indirectly, PDM's violations and is therefore liable as a controlling person of PDM, pursuant to 7 U.S.C. § 13c(b), for PDM's violations of 17 C.F.R § 4.20(c).

## COUNT ELEVEN

### Violations of Regulation 4.21(a)(1), 17 C.F.R. § 4.21(a)(1) (2022)
### (Failure to Provide Disclosure Document)
### (PDM and Dendinger)

151.    17 C.F.R. § 4.21(a)(1), requires each CPO registered or required to be registered under the Act to deliver or cause to be delivered to a prospective pool participant a Disclosure Document prepared in accordance with the Commission's Regulations.

152.    During the Relevant Period, PDM failed to deliver to prospective pool participants a Disclosure Document prepared in accordance with the Commission's Regulations.

153.    Each failure to deliver a Disclosure Document to a prospective pool participant is alleged as a separate and distinct violation by PDM of 17 C.F.R. § 4.21(a)(1).

154.    Throughout the Relevant Period, Dendinger held and exercised direct or indirect control over PDM, and either did not act in good faith or knowingly induced, directly or

indirectly, PDM's violations, and is therefore liable as a controlling person of PDM, pursuant to 7 U.S.C. § 13c(b), for PDM's violations of 17 C.F.R § 4.21(a)(1).

## COUNT TWELVE

### Violations of Section 6(c)(2) of the Act, 7 U.S.C. § 9(2)
### (False Statements to the Commission)
### (Dendinger)

155.    The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

156.    Section 6(c)(2) of the Act, 7 U.S.C. § 9(2), makes it unlawful "for any person to make any false or misleading statement of a material fact to the Commission, . . . or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading."

157.    In June 17, 2021, response to the CFTC's subpoena Dendinger made false or misleading statements of material fact while he knew the statements he made to be false or misleading, in violation of 7 U.S.C. § 9(2).  Specifically, Dendinger falsely stated that "No accounts controlled by the parties were used to enter into any transactions involving any Financial Products as defined in the Subpoena Documents that the parties are aware of."

158.    On July 22, 2021, in a letter from his counsel to the Commission, Dendinger made false or misleading statements of material fact while he knew the statements he made to be false or misleading, in violation of 7 U.S.C. § 9(2).  Specifically, Dendinger falsely stated that he and PDM had "no accounts in their names with any futures commission merchant, nor have then engaged in any trading of and Financial Products".

159.    Each false and misleading statement of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(2).

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that Defendants Flip 2 Futures and Miller violated Sections 4k(3), 4m(1),

and 4*o*(1)(A)-(B) of the Act, 7 U.S.C. §§ 6k(3), 6m(1), 6*o*(1)(A)-(B), and Regulations 1.31,

4.30(a), 4.31(a), and 4.33, 17 C.F.R §§ 1.31, 4.30(a), 4.31(a), 4.33 (2022);

B.    Find that Defendant Miller further violated Regulation 3.12(a), 17 C.F.R.

§ 3.12(a) (2022);

C.    Find that Defendants PDM and Dendinger violated 7 U.S.C. §§ 6k(2), 6m(1),

6*o*(1)(A)-(B) and Regulations 4.20(c), and 4.21(a)(1);17 C.F.R §§ 4.20(c), 4.21(a)(1) (2022);

D.    Find that Defendant Dendinger further violated Section 6(c)(2) of the Act, 7

U.S.C. § 9(2) and 17 C.F.R. § 3.12(a);

E.    Enter an order of permanent injunction enjoining Defendants Flip 2 Futures and

Miller, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all

persons in active concert with them, who receive actual notice of such order by personal service

or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6k(3),

6m(1), and 6*o*(1)(A)-(B), and 17 C.F.R §§ 1.31,  4.30(a), 4.31(a), and 4.33;

F.    Enter an order of permanent injunction enjoining Defendant Miller, and his

affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active

concert with him, who receive actual notice of such order by personal service or otherwise, from

engaging in the conduct described above, in violation of 17 C.F.R. § 3.12(a).

G.    Enter an order of permanent injunction enjoining Defendants PDM and

Dendinger, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and

all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6k(2), 6m(1), 6*o*(1)(A) and (B), and 17 C.F.R §§ 4.20(c), and 4.21(a)(1);

H.      Enter an order of permanent injunction enjoining Defendant Dendinger and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above in violation of 7 U.S.C. § 9(2) and 17 C.F.R. § 3.12(a);

I.      Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)  Having any commodity interests traded on any Defendants' behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

J.      Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

K.      Enter an order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including prejudgment and post-judgment interest;

L.      Enter an order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the pool participants whose funds were received by Defendants, as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

M.      Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act,

7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, see Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

N.    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920, and 2413(a)(2); and

O.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: February 22, 2023                    Respectfully submitted,

By: */s/ Christine Ryall*

CHRISTINE RYALL
Chief Trial Attorney
cryall@cftc.gov
Florida Bar # 0983550

JULIA COLARUSSO
Trial Attorney
jcolarusso@cftc.gov
D.C. Bar # 1010466

PAUL HAYECK
Deputy Director
phayeck@cftc.gov
Mass. Bar # 554815

Attorneys for Plaintiff
COMMODITY FUTURES
    TRADING COMMISSION
1155 21st Street, NW
Washington, D.C.  20581-0001
Phone:  (202) 418-5000
Fax:  (202) 418-5521